Cases called Palos Community Hospital v. Humana Insurance Company, 1-23-1917. The justices you have before you are Justice Cynthia Cobb, Justice James Fitzgerald Smith, and Justice Aurelia Puchinski. Our sequence of events are that the appellant will go first and have 5 to 10 to 15 minutes to express themselves, at which time we will then ask questions. We will not interrupt you unless you get way off on tangents. Then the appellee will have the same and then the appellant will have their ability to conclude. With that in mind, I will let Aurelia make her brief statement. Aurelia. Thank you, Justice. I just wanted to apologize to counsel and everybody in the Zoom. For some reason, my video is not connecting to Zoom, so I can see everything that you're doing. I can hear everything that you're doing. I just, you just can't see me, which is too bad because I put on lipstick, especially for this oral argument, but I do apologize. Thank you. All right, the appellant may proceed. Good afternoon. Thank you, your honors. May it please the court. My name is Everett Seigel, and I represent the plaintiff appellant, Payless Community Hospital. I'd like to focus my presentation this afternoon on two points. First, this court should reverse the grant of summary judgment in favor of Humana Insurance Company and direct the trial court on liability in favor of Payless on his claim for breach of contract and to set the case for a jury trial on damages because there is no ambiguity in the 1990 micro-risk contract and Humana Insurance Company did not become a party to that contract as a matter of law. Second, and in the alternative, the court should reverse the grant of summary judgment in favor of Humana Insurance Company and remand the case to the trial court for a jury trial on both liability and damages because at best for Humana Insurance Company, there is conflicting evidence if this court finds an ambiguity in the July 1991 amendment to the Michael Reese agreement as to whether or not Humana Insurance Company became a party than the 1990 Michael Reese contract. The first step, your honors, in this court's de novo review is to determine whether the July 1991 amendment to the Michael Reese agreement adding a PPO product is ambiguous or not. That is a question of law for the court. We submit, your honors, that that amendment to that contract is not ambiguous, that it did not add Humana Insurance Company to the 1990 Michael Reese contract. If it did not add Humana Insurance Company to the 1990 Michael Reese contract, then Humana Insurance Company was obligated to pay Payless the rates agreed to under the choice care contract. Our Supreme Court in air safety, quoting Western Illinois versus Thompson, discussed the rules of contract interpretation and stated that they require an agreement when reduced to writing, must presume to speak the intention of the parties who signed it. It speaks for itself and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence. This, your honors, is the familiar four rule and when it's here, there's an explicit integration clause. Rule evidence cannot be admitted even provisionally to find a hidden ambiguity on what is a facially unambiguous contract. Now, what is undisputed about the 1990 Michael Reese contract and the 1991 amendment? First, Humana Insurance Company does not appear anywhere in that agreement or the 1991 amendment. That amendment, as I said, only adds a PPO product. Nor did Humana Insurance Company sign that agreement or the amendment. It is undisputed that Humana Health Plan, Inc., which is a completely separate Humana company, not Humana Insurance Company, purchased the assets of Michael Reese in 1991. I believe it was February 22nd according to the testimony of Humana's witness, Mr. Maxwell. It is also undisputed that Humana Health Plan is the only assignee of the Michael Reese contract. Those admissions were before the trial court during summary judgment and the briefing in the form of Mr. Maxwell's affidavit as well as his testimony. Indeed, Humana Insurance made the same concession in its brief before this court on page 5. In February 1991, MHRP, which is a reference to the Michael Reese contract, was acquired by Humana Health Plan, Inc. Because Humana Insurance Company neither purchased the assets of Michael Reese nor became a party to the 1990 contract by assignment, it could only have become a party to that agreement by one way, a valid written amendment. Now, that brings us to the July 1991 amendment because that added a PPO called Humana Health Care Plan's Preferred Provider Organization. But the July 1991 amendment, Your Honors, we submit is facially unambiguous on this point. It doesn't add Humana Insurance Company. By its plain terms, it just adds a product, a product line called the Humana Health Care Plan's Preferred Provider Organization. Now, the lower court tied itself in knots trying to identify the operator of the Humana Health Care Plan's Preferred Provider Organization, but that exercise is legally irrelevant in resolving Palos' claim for breach of contract. The Michael Reese contract was a contract between Humana Health Plan, which was the one and only one assignee. The contract stayed between Humana Health Plan as the one and only one assignee of Michael Reese and Palos Community Hospital. There are only two parties to that July 1991 amendment, and Humana Insurance Company and its witnesses concede that Humana Health Plan signed that amendment. Now, in order to add a party to a contract by way of amendment, there needs to be an offer, an acceptance, and a meeting of the minds. The words, there has to be words that would lead to the effect that Humana Insurance Company was being added to the contract. As this court has stated, in the Arborgas case, the most common way of mutual incentive is a signature. Humana Insurance Company did not sign that amendment. Weren't they bound by their conduct? Your Honors, that was one of the arguments that the lower court accepted, and we believe that that does not make them a party to the contract for a number of reasons. And in fact, I think there are three equally important reasons why the course of performance argument does not make Humana Insurance Company a party to the Michael Reese contract. First, there is no evidence to support Humana Insurance Company's bald assertion that it paid $1,000,000 in insurance payments in 1991. Payless asked for that information in the discovery, and it was told that it was unavailable. The earliest information that was produced in the case, and this was a spreadsheet from Humana Insurance Company, showed claim payments in 2000. That's the earliest. But the evidence was of limited value because at that time, Payless had another agreement with a PPO administrator called PHCS, Private Healthcare Systems, one of whose shareholders was Humana Insurance Company. And that testimony, Your Honor, was uncontested, testified to by Humana's witnesses, and was before the trial court. And in fact, in the prior decision, before the first district, before the Supreme Court ruled in this case, it was noted that in January 1998, and this is from the vacated decision of the Sixth Division of the First District, Payless entered into a provider agreement with Private Healthcare Systems, PHCS, which was a consortium of insurers who agreed on a common set of PPO terms under which Payless would be reimbursed for services provided to their members. One of the insurers in the consortium was Employers Health Insurance Company, a Humana entity. Now, in 1999, and the letters that Payless received from Employers Health, PHCS, Humana were in the record for the lower court. They were also supplied to the appellate court on the prior appeal. The letter was sent saying Employers Health Insurance Company, the Humana PPO network, which is currently managed by PHCS, will now be called ChoiceCare. So, to the extent that there were claims paid in 2000, the evidence is of little to no evidentiary value because there were other Humana Insurance Company PPOs that the hospital had agreements with at the time. I just have one question about this. The payments that Payless was receiving, there was testimony that they were labeled as coming from Humana Claims Office. They were never labeled as coming from Humana Insurance Company. Is that right? That's correct, Your Honor. One of the things that Payless put in its briefs, and one of the things, if Your Honors think there is a question of fact, and one of the reasons why we think the lower court erred on this point, is we went through in our briefing, both in our response to Humana Insurance Company's motion for summary judgment and in our motion for summary judgment, on what is called the revenue cycle and the difficulty that the hospital had in determining how these claims were being processed by Humana. All of them go to, and you could see these on the cards, they go to a generic address in Lexington, Kentucky that just say Humana. Now, the hospital sends its bills. They're uniform bills that's governed by the federal government. They send their undiscounted rates. And what the hospital does is they provide the plan number. And Humana's witnesses testified that medical providers rely on the insurance companies to do the appropriate discounts. That's the case with Payless. Now, Payless over time, and we have the STEFO letter that the prior panel on the first time that this case came up for review referenced, and that was before Judge Essrig, as well as the information that was contained in our briefing. And this is, Your Honors, I will reference this. This was in plaintiff's reply in support of its motion for summary judgment. And this is in the record in volume 27 at C39160. On page five of that brief, we go through and talk about citing to various witnesses how it was the difficulty that we had determining how these claims were paid and when the hospital did determine that, the objections it made over time. So, to the extent that the trial court thought that the evidence was one-sided, we respectfully submit that the court got that wrong. There was significant evidence in the record as to the problems that the hospital faced in interpreting the explanation of benefits that from the Humana processors in Kentucky as to whether or not who was the actual payer on those bills. And I could go through the record and cite to where all of that is in the briefs if Your Honors are interested. But I think that's an important point because to the extent that these claims were processed by a generic Humana entity, it doesn't prove anything. And in fact, we had submitted to the court during summary judgment briefing explanations of benefits attached to one of our briefs that showed that Humana Inc. had paid some of the claims. So, the notion that these payments could have created a contract, I think, does not hold up as a matter of law. The other point that I think is critical for the court to consider on this is when this contract was negotiated, the only extrinsic evidence about the negotiations of the July 1991 amendment came from Payless. David Manchester, who was a vice president at the time, testified as to what he was told. No one from Humana testified who was there at the meeting. David Manchester kept contemporaneous notes. He testified that he was told that Michael Reese Humana Health Plan was going to operate a PPO, not Humana Insurance Company. He testified that no one said to him that they were going to add a third party to the contract. He testified that this PPO was going to be for government employees. Mr. Maxwell testified that that's also true, that it was for Cook County employees. So, there is some agreement in the record on that. But the reality is whoever Humana Health Plan decided to use as the ultimate payer is of little or no significance because it operates no differently than the ChoiceCare contract, which is the other contract in this case. Payless signed an agreement with ChoiceCare that said ChoiceCare would operate a network. ChoiceCare went out and signed payer agreements with various insurance companies, one of them being Humana Insurance Company. The ChoiceCare agreement is very clear that there's no direct contractual agreement between Payless and Humana Insurance Company. The payer agreement between Humana Insurance Company and ChoiceCare is very clear that those two Humana entities are distinct and separate entities. They have separate management and they cannot bind each other. And so, the only way that Payless is able to sue Humana Insurance Company at all under the ChoiceCare contract for failure to pay those rates is because hospital providers are explicitly identified as third-party beneficiaries. So, Your Honor, the way the 1990 Michael Reese contract operated is no different. If Humana Insurance Company indeed was the payer on these claims, if they could prove that and there's no evidence for them to do it, but if they could, it would just purely show that they were operating as a subcontractor for Humana Health Plan, the party that signed the agreement, the party that told David Manchester, we're going to start an HMO or a PPO in Chicago for county employees. That's what the hospital understood. That's what the hospital agreed. The hospital wasn't told and didn't agree that Humana Insurance Company would become a party to that contract. And, you know, the lower court was persuaded by the argument that, well, Humana Health Care plans, that's our trade name. That's a doing business as for Humana Insurance Company. And I'd like to address that, Your Honors, because Payless submitted significant evidence in the record during summary judgment that that is simply not true. And that argument that it's a trade name for Humana Insurance Company is really unsupported by the record. Payless had submitted certified copies from the National Archives of complaints that were filed in the 90s, almost immediately after Humana Health Plan purchased the assets and took the assignment of these contracts, where Humana Health Care plans, the alleged DBA for Humana Company, was sued by employees who said they work for Humana Health Care plans. And they sued him for employment and civil rights violations. And who appeared in those cases as the true defendant? Because Humana Health Care plans is not an entity. It's an unregistered DBA. It wasn't Humana Insurance Company, even though Humana Insurance Company will tell you, Mr. Payless, in the next two minutes, that it was them. It was Humana Health Plan. They came in and told those courts in verified pleadings and in file and pleadings, they admitted that Humana Health Plan was Humana Health Care plans. When the 1990 micro-risk contract was going to be renegotiated, and this is in the record, Humana Health Care plans sent the letter. Their letterhead, it was the address on Martin Luther King Drive of Michael Reese. And it said, Michael Reese, Humana Health Care plans. It didn't say Humana Insurance Company. Clearly, this was a DBA for Humana Health Plans, HHP, the entity that took the assignment of the contract. Your Honor, that's consistent with the notes that Mr. Manchester took when he agreed to allow the HHP PPO into the contract. And one last point on this, because I see that my time is growing short. It makes no logical sense to say that Humana Health Care plans is an unregistered DBA for Humana Insurance. The party that took the assignment to that July 1991 amendment was Humana Health Plan, Inc. The PPO product that was mentioned in that assignment was Humana Health Care Plan PPO. The only difference was the insertion of the word care. Now, why would Humana Insurance Company, if it was going to operate under a DBA, would it take its affiliate's and just insert the word care in between health and plan and then say that that was their DBA for Humana Insurance Company? It makes no sense, Your Honor. That is clearly, if it was a DBA for anybody, a DBA for Humana Health Plan and Michael Reese. So, I see that I'm close to out of time. If there are any other questions, I'd be happy to address them. The only other point I would make would be on the amendments from 2005 and 2008, if the court is interested. You may express briefly as to that. Okay, thank you, Your Honor. So, what I would say is, and this I think is important, is Humana Insurance Company has said with respect to those amendments, both in their brief before, Your Honors, and also in their reply brief in support of their motion for summary judgment. To be clear, HIC's position is that those amendments confirmed that HIC had been a party since 1991 and not that they had added HIC for the first time in 2005. That same sentence appears word-for-word both before the trial court and Your Honors. That we submit is an admission that those amendments standing alone do not add HIC to the contract, and that makes sense because they can't. Now, the language, to be clear, I think is Humana Insurance Company saying, without ambiguity, that those amendments did not add Humana Insurance Company to the contract. Now, if Your Honors find that the July 1991 contract or amendment did not add Humana Insurance Company, then these amendments are irrelevant. If there is an ambiguity in that, then at best, these amendments may be something that go to the jury. But I would say this, they are of limited evidentiary value because of what's in them. They say that these contracts were entered into in February of 1991. That's not true. The preparatory recitals are wrong. The contract was entered into in 1990. There was an assignment in 1991, but the contracts themselves were not entered in 1991. They also add other Humana entities that either don't exist or have no relationship to this contract. And the last thing I would say, Your Honor, and I think this is the most important, and these were attached to our appendix. And so if Your Honor is interested in looking at them, but the plain language of the amendments themselves, and we cited a bunch of case law as to why the amendments are not binding and I'm sorry, the amendments are attached to the CAPLI's special appendix. But what they say is they identify the contract in a ham-handed, mistaken way. And then they say this, and they define it as the agreement. And then they say the agreement is hereby amended as follows. So that just accepting the plain language of the words on the page, the preparatory language is telling everyone who reads it that what was changed in the agreement is what is follows. Not what's in the preparatory language where they're trying to define the contract and where they do it in a way that they screw it up, but is what is follows. And what is follows in both the 2005 and 2008, they delete something called Appendix A. Well, Appendix A was attached to the 1990 Michael Reese contract. Appendix A is a very simple document. It just sets the compensation that is to be paid to Paylos for patients that it services under that agreement. And it says Appendix A is deleted in its entirety and replaced with new rates set forth below. And then it goes through and you could read how the rates change. And then it says immediately after they go through the changing of the rates, all other terms and conditions of the agreement except as hereby amended shall remain in full force and effect. So the parties were very clear that this agreement was only replacing Appendix A and changing the rates to the 1990 Michael Reese agreement. They weren't adding surreptitiously through this preparatory language parties. The testimony was that this was prepared not even by the people who negotiated it, but inserted after the fact by the people in Lexington who prepared the document. The only thing that was negotiated between Mr. Gordon and Mr. Manchester was, as the amendments say, is hereby amended as follows, which were the rates. You can't wrap that up. All right. For all these reasons, Your Honor, we ask that you reverse the judgment of the lower court and that you would enter judgment in favor of Paylos on liability, finding that the July 1991 amendment did not add Humana Insurance Company as a party to the 1990 Michael Reese agreement and therefore finding that Humana Insurance Company had to pay Paylos the rates under the Choice Care Agreement and remand the matter for a damages trial. Or in the alternative, reverse the trial court's ruling on summary judgment and remand the matter back for a further trial on damages and liability as to whether or not Humana Insurance Company became a party to the contract via the July 1991 amendment. And I thank you for your patience. Questions? Hearing none, I guess I'll let Mr. Joseph proceed. Thank you, Your Honor, and may it please the court. James Joseph on behalf of Humana Insurance Company or HIC. I heard a lot of breaking news today and a lot of things I haven't heard in many years on this case. And so I'll try to address those as we go along. But I want to begin by saying that the sole and narrow issue in this case, as I think everybody agrees, is whether HIC was a party to the 1990 direct contract during the relevant period from 2004 to 2010. And the judgment should be affirmed because the circuit court properly determined that HIC was a party beginning in 1991. This is for three reasons. First, the four corners of direct contract do identify HIC as a party. So HIC prevails even under the standard proposed by Palos. Second, the circuit court was nevertheless entitled to consider extrinsic evidence on that subject. And third, the circuit court was correct that all of that evidence objectively demonstrated that HIC was a party beginning in 1991. Palos consciously declined to controvert that evidence because the evidence was incontrovertible. Now, let me begin with the first point, the four corners argument. Palos seems to contend that the only piece of paper this court can consider in determining whether HIC was made a party was the 1991 amendment. That suggestion directly contradicts the holding of this court in the Palos 1 decision where at paragraph 34, it said, a contract must be interpreted as a whole. And when amendments are made, courts must consider all parts of the agreement to determine the party's intent. Now, we can have an academic dispute as to whether that holding is law of the case, but the court's reasoning is the same. It was just applying well-settled principles of law. It wasn't coming up with any new law. And it was applying them not to just some random contract, but to the very contracts at issue in this case. And that reasoning still applies here. The direct contract does not consist of just the 1990 agreement and the 1991 amendment. It also consists of amendments made in 1996, May, 2004, October, 2004, 2005, and 2008. And the 2005 and 2008 amendments resolved this dispute. Everyone agrees that the question is whether HIC was a party to the direct contract. The 2005 and 2008 amendments state unambiguously that it is. Palos doesn't dispute that wording. It doesn't dispute that it had four and perhaps five senior executives review and sign off on that language. It doesn't dispute that those amendments are valid and binding. And that resolves the matter. The court doesn't need to go any further. Now, in his wrap-up, counsel suggested that these are just non-binding preparatory recitals or mere boilerplate. But those arguments are both meritless. These are not just preparatory recitals. They expressly define who the parties are. But even if they were recitals, counsel concedes as a matter of law that when recitals are incorporated into the terms of the agreement, those would nevertheless apply. And Mr. Seigel read to you a portion of that amendment, but he didn't read to you all of it. Here's what follows with the very first sentence of the operative provision of the agreement, which we put a screenshot of on page 11 of our brief. It says, hospital, meaning Palos, agrees to bill and accept payment in full from Humana. And then it goes on. And Humana is defined to include HIC. So there is an operative provision there. Also, Mr. Seigel seems to think that the agreement is negotiated between two people. It's not. It's negotiated between two entities, Humana Insurance Company and Palos. And the fact that there may have been boilerplate, we don't agree that it was boilerplate, but even if it were boilerplate, that wouldn't matter either because boilerplate is enforceable contract language, just like any other contract language, particularly where is here the parties are sophisticated. So let me now move to the second point, which is whether the court was permitted to consider extrinsic evidence on this question. And the circuit court was correct to identify that the 1991 amendment was the amendment or the instrument that first made HIC a party. And one of the brand new things I've heard in this case today was that the PPO was just a product. But if you actually look at the plain language of the 1991 amendment, that's not what it says. What it says is that Palos agrees to provide services under the same terms and conditions specified in the hospital agreement for members of the preferred, excuse me, Humana Health Care Plans Preferred Provider Organization. Let me underline that word organization. Under the same terms and conditions specified in the hospital agreement for members of Humana Michael Reese Health Maintenance Organization. And I'll underline that word. An organization is by definition a distinct entity. And as that plain language indicates, it's agreeing, Palos is submitting itself to provide services under the same terms and conditions for one organization as it's doing for the other organization. Now, Mr. Seigel has suggested that, you know, this is just a subcontractor relationship for HHP. That's not only belied by the plain language of the amendment. It also just is not true in practice. And there was no evidence to show it was true in practice. What the effect of this amendment was, was to make HICs members or to make Palos an in-network hospital for HICs PPO members. So, what happens as a consequence of this amendment is that HIC includes Palos Hospital as a preferred provider in its network. It encourages and steers its members to go to the hospital. Members who go to the hospital get their services. The hospital takes the bill and sends it to HIC. HIC pays the bill. That's the transaction. It's a closed loop. And HHP has nothing to do with it. HHP is not a general contractor. It's not a subcontractor. It's not an administrator. It has no role whatsoever in that relationship because the members involved are not the HMO members. They're the PPO members belonging to a separate organization. And I should add that one of the really shocking things about this argument, which I think is also new, is that if HHP really were just a general contractor and the PPO were a subcontractor, then HHP should still be a party in this lawsuit. But in fact, even though it was originally named as a party in this lawsuit, Palos consciously and voluntarily dismissed HHP from the suit shortly before trial in 2018 because it accepted the fact that the HMO had nothing to do with the PPO or the PPO members. Now, there are several routes by which extrinsic evidence can be considered in this case. One is another point that Palos consciously ignores from the Palos 1 decision, which is that the fact that the words human insurance company don't appear in the 1991 amendment somehow renders it not a party. This court explicitly rejected that argument when Palos made it the first time in 2019. There in that same paragraph 34, this court said, the fact that HIC is not expressly identified in the 91 amendment does not render the amendment unambiguous on the issue of whether the amendment applied to HIC. So that's one method by which the court was entitled to examine extrinsic evidence. But there are also two doctrines that I want to address. One is from the Bilen versus Crenn and Dato line of cases, which provide that extrinsic evidence is always permissible to identify the parties to a contract, especially those as here operating under a business or trade name. And the other is the malleable iron range line of which provide that the court can look to extrinsic evidence to identify or to correct even a misnomer. And the important feature of those two doctrines is that they may be applied to consider whether someone's a party, regardless of whether the actual words are ambiguous or not. So the court was entitled to rely on those doctrines as well. Palos doesn't address these doctrines at all in its opening brief. It doesn't address them by name until a footnote in its reply brief. And the only thing it says in response is that those doctrines don't apply because HIC is not a quote contract party. That's what it says. But the whole point of those doctrines is to establish whether somebody is a contract party. So Palos' response is not responsive. Now, as I mentioned, the Humana Healthcare Plans Preferred Provider Organization isn't just mentioned. It's made a party by Palos' submission to provide services on the same terms and conditions as it's providing to the HMO. And Palos does not dispute the well-established doctrine that where one party signs an agreement and the agreement is delivered to the other party who accepts that agreement through performance, then the second party's signature isn't necessary. And that's exactly what HIC did here for the ensuing 19 years, and frankly, to the present, except that we put 2010 as the end period because the contract was novated at that point. I just want to correct something that Mr. Seigel said, which is that HIC didn't pay Palos' bills until 2000, and that when it did, those payments were made under the PHCS contract. So both of those things are false. And I would direct the court to page 15 of the Blue Brief, where we quote Mr. Maxwell, who says repeatedly over and over and over again that when that, I'm quoting from the middle of the page here, that from 1991 forward, when a Humana PPO member went to Palos and obtained treatment, Palos sent the bill to HIC, HIC paid it. He was a precipient witness. He was there at the time. And even though there are checks and ledgers and so forth, probably because this was 20 years before the lawsuit was filed, it's still uncontradicted evidence. Furthermore, to Justice Piccinci's question about the 2000 payments and evidence of them, so the uncontradicted evidence before the circuit was that from 2000 to 2002, HIC paid 3,000 claims worth $4 to $5 million. Now, it couldn't have been PHCS claims because PHCS was out of business by that point. It couldn't have been ChoiceCare at that point because Palos hadn't signed an agreement with ChoiceCare yet. So the only option is that those payments were made by HIC. And Justice Piccinci, to your question as to the evidence, again, this was something, two things that I heard today that I've never heard before. One is that Humana, Inc. was paying the bills. Mr. Seigel and his colleagues did not present that argument to the circuit court. What they suggested was that HHP was paying bills, and then we demonstrated on the record that that was wrong. And the other thing is that there were actually indications that HIC was paying the bills. And here I would direct the court to the affidavit of Lori Pointer. This was our Exhibit 16 to our Summary Judgment Motion, beginning on the record at C37724. And there are a number of exhibits attached to that to demonstrate that checks were made and sent by HIC to Palos Hospital. All of that evidence was uncontradicted. And I'm hearing for the first time today that somebody else was paying the bills, and it's just not true. There is no objective evidence to show that anyone besides HIC paid the bills. Now, this leads me to my third point, which is that the circuit court was correct to find that all of the extrinsic evidence showed that HIC was a party starting in 1991. And here I want to highlight five key uncontroverted and dispositive items. No matter what you're hearing today, they were uncontroverted below. Number one, there's no human entity besides HIC that was a licensed Class I insurance company authorized to offer PPO plans in the state of Illinois. PPO plans are insurance. An insurer underwrites the risk, and there was no entity besides HIC that was authorized to do that in 1991 or during the relevant period here. There's no dispute, as I just described, that HIC actually- Mary Gamba, Ph.D.: Mr. Joseph, can I just ask a question about that? If HIC, the appellee in this case, was the only insurance company that was authorized to pay an insurance claim in 1991, why wasn't HIC a signatory to the amendment in 1991? Dr. Joseph Josephson The answer to that, Your Honor, is because, well, it may have been the case that HHP was handling negotiations, but it didn't need to be a signatory. The fact that it wasn't a signatory didn't, as I described before, it doesn't not make it a party to the contract. It may have been the case that one person at Humana Health Plans undertook the negotiations, but from Palos' perspective, it doesn't matter. Palos was presented with an amendment where it was shown a different organization is going to be sending it PPO patients, and it agreed to that, and it permitted an accepted performance of that for the next 20 years. So, in our view, it's not legally relevant that HIC was not a signatory. Would it have been better if HIC had explicitly signed it? Yeah, no question. I acknowledge that. But the fact that it didn't does not make it not a party to the agreement for the reasons I've described. So, let me go to the, I mentioned two pieces of evidence. Let me describe three more. The first is that Palos' own witness acknowledged, and we quoted this in our brief, own witnesses acknowledged that there was a concurrent Humana PPO contract, and the Humana PPO contract was administered by HIC, and their own operational witnesses conceded that Humana PPO patients came to the hospital before the choice care agreement was enacted. So, no dispute that there was an ongoing course of performance there involving HIC's members. Fourth, it's law of the case because this part even if, I'm sorry, did somebody have a question? I know you can't see me. You can just hear me. So, I apologize for not speaking more loudly. But are you talking about the period during which the Palos was accepting PPO patients only from the City of Chicago and Cook County employee base? So, there's no evidence, Your Honor, that it was only accepting employees from the City of Chicago or Cook County. And it wasn't that the reason for the, one of the reasons for the 1991 amendment was to make sure that City of Chicago employees who wanted a PPO and Cook County, I think, and Cook County employees who wanted a PPO would be covered by the Humana Health Plan's preferred provider entity, even though there doesn't seem to be any such entity, and that Michael Reese would, Palos would take those patients and treat them. So, there are two responses to that, Your Honor. As Mr. Maxwell testified at trial, every company has a first client. And to the extent that was its client, that was it. But there was no expectation. And all of the witnesses, including Palos's witnesses, agreed to this. There was no understanding or agreement or representation or anything that it would be limited to that one client. And there's nothing in any of the objective agreements here that limits it to that one client. It covers all Humana PPO members. As a matter of fact, during the trial, Mr. Gordon testified that the City of Chicago, by that point, was not a client. And he knew that because his wife was at Cigna. Cigna got the client. And they were so happy about landing such a big client that they threw a party about it. But the court doesn't need to go that far. It's an objective matter. There's no limitation to the City of Chicago or the Cook County, even if that was the first client. So, to return, as of 2004, and Justice Buczynski, I want to stress this. Let's just suppose it was the PPO. Let's just suppose that. Well, any questions about Palos's knowledge is resolved in 2004, because it is law of the case. Because this was a ruling issued by Judge Taylor before Judge Shelley took the case. So, this does remain law of the case. It's law of the case from essentially from paragraph 52 in the Palos 1 opinion on that Palos was on notice of its injury, alleged injury, this rate discrepancy, as of 2004. So, to the extent there was any misunderstanding or misconstruction, that evaporated by 2004, because now it's on notice of what the problem is. And what's the very next thing it does? This is just a few months later. It signs the 2005 amendment that explicitly identifies HIC as a party. It has four, perhaps five executives sign off on that without raising any surprise or objection. And then it does the same thing again in 2008. So, even to the extent there's any subjective misunderstanding as to who the party is, all of that has to be cleared up as a matter of law by 2004, because that's when it's been established that Palos was on notice of this very problem. And fifth, I want to, the fifth piece of evidence I want to raise is that there's no dispute that HIC paid in-network humana PPO rates for patients who were members of the PPO, but did not have the choice care option during the relevant time period. That would have been possible if there were not already some contract that governed the relationship between Palos and HIC. So, there's no reason to assemble another jury because the evidence establishes clearly and free from doubt, the objective fact that no PPO was party to the direct contract other than HIC. And your honors, perhaps the surest confirmation of that is this. After five years of discovery, hundreds of thousands of pages of documents, over 20 depositions, a two-week trial involving 12 witnesses, Palos still today can't tell you who the PPO was in the 91 amendment if it wasn't HIC. It offers three options, but none of those work. It suggests HHP, but it can't be that because that was an HMO not licensed to offer insurance in Illinois. It suggests PHCS. It can't be them because PHCS was a PPA, which is forbidden under Illinois law from underwriting risk. And furthermore, it didn't come on the scene until 1998, which is seven years after the 91 amendment. And finally, for the first time on reconsideration and in a footnote of its opening brief, it suggests a third entity, Humana Health Chicago. But notwithstanding all the problems evidentiary and otherwise with that submission, there's no dispute that that entity merged into HIC in 2000 four years before the relevant period here. And consequently under section 4.4 of the original agreement, which can be found at appendix page 111, HIC would have succeeded to its rights and obligations as a direct party anyway. Now, contrary to its position below where it argued that any ambiguity required a trial, Palos now concedes that where the extrinsic evidence shows that there's no dispute of fact, a contract may be construed as a matter of law and summary judgment is proper. And the evidence that compels summary judgment for HIC precludes it for Palos. Here, the facts are undisputed, and that was by Palos' own conscious choice. And I'd like to one more thing. In May of 2022, at the first status conference after remand from the Supreme Court, the circuit court asked whether fact discovery was complete and closed. And Palos' counsel responded, that's right, Your Honor. That's at the report of proceedings at page 215. Six months later, the parties filed summary judgment motions and Palos knew that it had no evidence showing the PPO was someone other than HIC. So it pushed all its chips in on the court's argument that the court couldn't consider extrinsic evidence. And then after losing on summary judgment, it scrambled to contend for the first time that there were disputed issues of fact, and it sought to introduce new evidence, though as I've explained, none of that evidence actually does create a triable issue of fact. It should be wrapping up. Your Honor, Palos contends that it should be that its forfeitures below should be ignored because that's a limitation on the parties rather than the court. But those rules should be applied here because they serve to prevent unjust outcomes and to prevent a party like Palos from obtaining reversal based on its own inaction. HIC was a party to the direct contract. Palos has not and cannot adduce evidence to show otherwise, and we therefore request that the judgment below be affirmed. I welcome the court's questions. Any questions? Hearing none. Justice Cobbs, you may be on mute. I can't hear you. Your speaker is not on. Bob, your speaker is not on. She's having issues with her microphone, Justice Smith. You know, she's having issues with a microphone. We've been having issues with Zoom, and I apologize for myself. And I think that that's what Justice Cobbs is trying to do here now, because she can see that you can't hear her, but you can see her. You can't see me, but you can hear me. And we think that it's a Zoom problem, but we apologize for the inconvenience to counsel. And please understand that we have all read the briefs. We've all read the record. We've all read the cases cited. So, you know, we get what you're saying. Everett, you may respond now. Thank you, Your Honor. I can hear you. Good. Thank you. And I will speak up. I'd like to start where... We could hear both of you, clearly, and you guys have made some pretty good arguments. So, proceed, but don't take an hour, please. I won't. I will be to the point, Your Honor. I'm going to start where counsel left off. The fact that fact discovery was closed, and we said it was closed, I think is irrelevant to the issue of whether there's a genuine issue of material fact. If Your Honors find that the July 1991 amendment is ambiguous, there had been years and years of discovery. Your Honors are very familiar with the standard for summary judgment as the non-movement to Humana Insurance Company's motion for summary judgment. Those inferences should have been drawn in favor of Palos. They should have been drawn in favor of Humana Insurance Company not being a party to that contract. And there was sufficient evidence in the record, and I can go through all our briefs if we need to, as to all the factual issues that Palos raised in response to the motion for summary judgment, including starting on page six of that brief, all the way to the end, addressing the affirmative offenses and the main claims where we cited the trial testimony of Phyllis Marazzo, the trial testimony of Donna Offerman, the trial testimony of Mr. Maxwell, the trial testimony of Mr. Manchester. We have the certified copies from the National Archives, the letters, the exhibits. We had a significant amount, you could see in the index, of evidence that we put in. Now, one of the things that counsel said is that he heard something new in my argument regarding who was paying some of these claims. I would respectfully submit that maybe counsel just missed it in our briefs. But if you look at the appendix to, and this is Palos Community Hospital's opposition to the defendant's motion for summary judgment, we have a cumulative index of everything that we cited. Exhibit 39 and exhibit 40, or exhibit 39, I should say, are redacted remittance payments from Humana. And if you go to, your honors, page 12 of that brief, and this is in the record in volume 27 at C39130, it states, which particular Humana entity sent each remittance was not a notable fact. It was not unusual for Palos to receive payment from one Humana entity for patients that appeared to be in a different Humana entity's plans. See exhibits 38 through 39, remittance showing Humana Inc. as payer for patient with a Humana insurance company. We have a cumulative index of everything that we cited in our briefs. And if you look at the appendix to, and this is in the record in volume 27 at C39130, we have a cumulative index of everything that we cited for a patient that appeared to be in a different Humana entity for patients that appeared to be in a different Humana entity. And if you go to exhibit pervert provider organization, that was the PPO. How HHP, Humana Health Plan, exercised its obligation to operate that PPO was Humana Health Plan's business. That didn't create a new party to the contract. Now there were questions put to council about what that PPO was all about. Mr. Maxwell testified. This is in the record in volume 27 at C38849. This was Mr. Maxwell's testimony. It was supplied, I believe, as exhibit seven to ALIS's briefs and as exhibit 35 to Humana insurances. So you start with the old Michael Reese, which was at that point purely an HMO. And this is on page 75 of the trial transcript at line 16, right? Answer, it was an HMO question. And you switch over to go to work for Humana entity for the purpose of building a PPO network in Chicago. Answer, that's right. And I think you said the first client that was signed up was Cook County employees. Answer, that was the entity we were building the network specifically for. Question, and so that would have been Cook County employees and their dependents? Answer, that's correct. Question, and would that have included sheriffs and forest preserve and court workers and all Cook County employees? This is answer on page 76, line 11. I think I'm not positive about this. The forest preserve may have been a different unit, but it was Cook County government employees. Question on line 15. So that's a fairly big size group answer. It is. That's what Mr. Manchester was told that this PPO was to be about. And that's what Mr. Maxwell testified to at trial, that it was going to be about government employees. Now, Judge Essrig had, and the appellate court had, and the prior case and noted it in its brief that in 1999, when PHCS came and was, or when Humana came and said that their entity, Employers Health, was leaving the PHCS network, they were starting something called the Choice Care Network. This is in the record at C-237. It was provided to Judge Essrig as part of the briefing on summary judgment. And what does this say? It says, we will continue to have a relationship with Employers Health Humana. Your contractual agreement will continue to be intact. But they go on to say the new network name for Employers Health Humana and Rolese will be Choice Care. So that contract in 1999, the old PHCS contract, suddenly based on what Humana was doing, became Choice Care. So to the extent that there were payments in 2000, they may be payments for Choice Care. They could have been payments for government employees. They could have been for county workers. No one knows what those $3 million in payments in 2000 were for. Its evidentiary value is meaningless. Counsel also stated that HHP should be a party to this case. That is a complete misdirection. Payless is suing under the payer agreement, Humana Insurance Company, because Humana Insurance Company agreed to pay the rates under the Choice Care contract. Those rates are specific and they're attached to a attachment to the Choice Care contract. There were over 19,000 over the damages period, 19,000 individual patients that Payless Community Hospital saw and treated under that contract that should have been paid at Choice Care rates that Humana secretly took discounts under this old 1991 contract, saying that it was a party based on this July 1991 amendment for Humana Health Care plans PPO. Now, the only way it gets to do that is if there's a provision in that contract that allows it to do it if there's a direct contract. We submit to your honors that this Michael Reese contract is not a direct contract between Payless and Humana Insurance Company. HHP has nothing to do with this case. The defendant is Humana Insurance Company for its breach of its obligation to pay the rates under the Choice Care contract. Can I ask you to wrap it up? Your honor, the last thing I would say is with respect to the recitals and those 2005 and 2008 amendments, this court's own case law says that those recitals are not binding. Those recitals are false. They talk about a contract being entered into in 1991. That's simply not true. For all these reasons, we think that the 1990 Michael Reese contract is unambiguous. It has an integration clause. The court should enter a summary judgment in favor of Payless in remand for damages or in the alternative. There were certainly enough factual issues with respect to that amendment to send the whole case back for a jury trial. Thank you. Any questions? No. All right. I thank you both. To be honest with you, this is a case that probably should have been settled. Even if it's sent back, it's going to be a nightmare for any judge because there's a lot not in the records that's clear. I just point that out to both sides. I don't know if either of you were initially involved in the initial works. I don't think so. There was a lot of sloppy contracting in between the different entities. As I say, this is a difficult one for us as well as you, but you guys really did a great job. You laid everything out that should guide us. Again, thank you both. You're both really good at what you do. Again, thank you.